UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,
100 F Street N.E.
Washington, DC 20549,

    Plaintiff,

vs.

ANCHOR BANCORP WISCONSIN, INC.
25 West Main Street
Madison, Wisconsin 57303,

and

DALE C. RINGGENBERG
5101 Camilla Road
Madison, Wisconsin 53716,

    Defendants.

Civil Action No.

COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges for its complaint, as follows:

## NATURE OF THE ACTION

1. This is a financial fraud case. Anchor Bancorp Wisconsin, Inc. ("Anchor") and its then-Chief Financial Officer ("CFO"), Dale C. Ringgenberg, intentionally or recklessly made misstatements in Anchor's quarterly Report on Form 10-Q for the period ended June 30, 2009. Ringgenberg signed the Form 10-Q on August 7, 2009, and Anchor filed it with the Commission on August 10, 2009.

2. The misstatements occurred because Ringgenberg took, or failed to take, actions to keep from correcting earnings that Anchor had already released to its shareholders. First,

Ringgenberg manipulated an estimate to offset an accounting adjustment required by Anchor's external auditors. Second, Ringgenberg refused or failed to properly account for real estate appraisals and related information that was available after the quarter closed but before Anchor filed its quarterly report.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

4. In connection with the transactions, acts, practices, and courses of business described in this complaint, the defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

5. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## DEFENDANTS

6. Anchor Bancorp Wisconsin, Inc. is a savings and loan holding company based in Madison, Wisconsin and incorporated under the laws of the State of Wisconsin. The principal Anchor subsidiary is Anchor Bank fsb, which conducts both retail and commercial lending. Anchor has securities registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its common stock trades on the NASDAQ Global Market.

7. Dale C. Ringgenberg, age 65, resides in Madison, Wisconsin. Ringgenberg was employed by Anchor starting in 1976. He ultimately became Anchor's Controller in 1992 and its CFO in July 2007. As of August 2010, Mr. Ringgenberg was no longer employed by Anchor.

## STATEMENT OF FACTS

8. Prior to June 30, 2009, Anchor had had several quarters of financial losses. In those quarters Anchor increased its allowance for lease and loan losses ("ALLL") and the related provision for lease and loan losses (the "Provision") because of increasing amounts of bad and at-risk commercial loans, coupled with decreasing values of the relevant collateral (i.e., real estate).

9. For example, for its quarter ended December 31, 2008, Anchor posted a loss of $7.96 per share that it attributed partially to an $85.2 million increase in the Provision. For the fiscal year ended March 31, 2009, Anchor had a loss of $228.3 million representing a decrease in net income of $259.5 million from its fiscal year-end of March 2008. (For its fiscal year 2009, the Provision increased to $205.7 million from $22.6 million in fiscal 2008.)

10. Two provisions of Generally Accepted Accounting Principles ("GAAP") for determining the ALLL are especially germane to this action: FAS 5, <u>Accounting for Contingencies</u>, and FAS 114, <u>Accounting by Creditors for Impairment of a Loan</u>.

11. FAS 5 applies for unimpaired loans and permits the use of loss factors based on historical loss experience.

12. For loans that are within its scope (heterogeneous, large-dollar commercial loans), FAS 114 allows, as a practical expedient, impairment to be measured based on the fair value of the collateral, if the loan is collateral dependent.

13. On July 28, 2009, Anchor issued a press release announcing improved financial results for the quarter ended June 30, 2009, using the headline: "ANCHOR BANCORP WISCONSIN INC. ANNOUNCES IMPROVED FIRST QUARTER RESULTS." The press release said Anchor had a net loss of only $11.8 million for the quarter (compared to a net loss of

3

$43.3 million for the previous quarter) and that the Provision had declined to $19.4 million from $56.4 million in the previous quarter.

14. On August 7, 2009, Ringgenberg signed Anchor's quarterly Report on Form 10-Q for its quarter ended June 30, 2009. Anchor filed the report with the Commission on August 10, 2009. The quarterly report stated that FAS 165, Subsequent Events, had become effective for the company on June 30, 2009 and that it "did not have a significant impact on [Anchor's] financial statements."

15. FAS 165 provides that events or transactions that occur after the balance sheet date but before the financial statements are issued should be reflected in those financial statements if those events or transactions provide additional evidence about conditions that existed at the date of the balance sheet.

16. On August 7, 2009, Ringgenberg also executed a "Certification of Chief Financial Officer" wherein he certified that he had reviewed Anchor's quarterly Report on Form 10-Q and that the report, based on his knowledge, did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. Ringgenberg certified that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of Anchor for the relevant period. He also certified that he and Anchor's other certifying officer had disclosed "[a]ny fraud, whether or not material, that involves management."

### Manipulation of Reserve for "Substandard Not Reviewed" Loans

17. Anchor had a formal policy that classified loans as substandard if the loan was inadequately protected by the current net worth and paying capacity of the borrower or the

collateral pledged. Within that policy, it was Anchor's practice to regard a loan as substandard when the borrower was delinquent for more than 90 days.

18.  Because of the volume of its problem loans, Anchor at June 30, 2009 had a number of loans that it knew were substandard but for which it did not calculate a FAS 114 specific reserve because of backlogs in the appraisal process. Instead, Anchor estimated a reserve based on the ratio of FAS 114 reserves to total substandard loans of the same bucket/type (e.g., Land and Development Loans, etc.).

19.  In other words, Anchor took its FAS 114 reserve experience to date, derived a percentage from the ratio of reserves to loans for each type, and used that percentage to estimate the reserve for the "substandard not reviewed" loans of the same type.

20.  Anchor began the use of this methodology for "substandard not reviewed" loans by at least the quarter ended March 31, 2009.

21.  Ringgenberg described this methodology for calculating the reserve for "substandard not reviewed" loans to Anchor's Board of Directors in a memorandum dated July 28, 2009. He wrote:

> Management contends that the charge-offs and specific reserves identified on loans already reviewed are representative of the loans remaining to be reviewed. As such, a representative loss ratio has been applied to the loans with reviews in process.

22.  In late July or early August, Anchor's auditors found an error in Anchor's accounting that was unrelated to the substandard not reviewed reserve: the auditors detected that Anchor had used the same FAS 5 loss factors to calculate the ALLL as of June 30, 2009 that it had used at March 31, without change. Anchor's auditors directed Anchor to recalculate the FAS 5 reserve estimate using updated information. The recalculation yielded an increase of approximately $4 million in the Provision.

5

23.  Before the error was discovered, Anchor's Provision had been $19.4 million. However, when Anchor filed its quarterly report, the Provision remained $19.4 million. Fixing the error should have increased the Provision and thus decreased income by $4 million. Instead, however, Ringgenberg "offset" that increase with a $4 million reduction in the reserve for "substandard not reviewed" loans.

24.  Here's how: Between the issuance of Anchor's earnings release on July 28 and the signing of Anchor's quarterly report on August 7, and after being informed of the $4 million increase resulting from the recalculation, Ringgenberg determined that, for "substandard not reviewed" loans, Anchor would record 50% rather than 100% of the representative loss ratios. Ringgenberg's change in the estimate reduced Anchor's Provision by roughly $4 million and offset the correction dictated by Anchor's external auditors.

25.  Ringgenberg had no support for his change in the estimate for "substandard not reviewed" loans. He did no analysis to determine whether 50% or some other number was appropriate, nor did he compare reviewed to unreviewed substandard loans.

26.  In a departure from Anchor's policy and practice, Ringgenberg did not discuss his change in the estimate with Anchor's ALLL Committee. In fact, no one else in Anchor's management was aware of Ringgenberg's methodology change until after Anchor's Form 10-Q had been filed.

27.  Ringgenberg's lack of evidence or support for the change in the reserve estimate contrasts sharply with Anchor's normal FAS 114 reserve calculation practice, where it employed an independent reviewer to hire qualified appraisers, review completed appraisals for quality, and opine on the validity of the appraisals.

28. In e-mail correspondence after the filing of Anchor's Form 10-Q, Ringgenberg described the change in the substandard not reviewed estimate as "a quick concept that I put together for the June quarter."

## Failure to Account for "Subsequent Events"

29. FAS 165 became applicable for financial periods ending after June 15, 2009 and therefore applied to Anchor's financial statements in its quarterly Report on Form 10-Q for the quarter ended June 30, 2009.

30. Both Anchor and Ringgenberg knew that FAS 165 "subsequent events" would be important for the company for its quarter ended June 30, 2009.

31. Anchor's external auditors had called attention to the subsequent events issue at Anchor's Audit Committee Meeting on June 10, 2009, which Ringgenberg attended.

32. Anchor's external auditors also raised concerns about subsequent events at the Audit Committee meeting on August 7, 2009 – the day Ringgenberg signed the Form 10-Q. The minutes for that meeting evidence the following exchange:

A discussion then ensued regarding the applicability of FAS-165 (subsequent events.) **Mr. Ringgenberg indicated that this subsequent events pronouncement has significant implications in determining the ALLL at quarter end.** [Anchor's auditor's engagement partner] indicated FAS-165 does not really create any new accounting requirements. It simply clarifies what the rules have been for many years. [Anchor's CEO] and [General Counsel] commented on the need to have a well documented, disciplined quarterly routine and cut-off to help ensure all loan loss activity is properly recorded at each quarter end.

(Emphasis added.)

33. Before he signed the Form 10-Q, Ringgenberg was aware of significant appraisals and other information received after the quarter-end.

7

34. As a result, for the quarter ended June 30, 2009, Anchor failed to properly account for $7.4 million of FAS 114 reserves that it was required to book in that quarter under FAS 165.

35. Ringgenberg deliberately or recklessly ignored the $7.4 million of FAS 114 reserves in order to keep Anchor's June 30, 2009 results consistent with the information that Anchor had provided the public in its earnings release of July 28, 2009.

36. Ringgenberg regularly reviewed FAS 114 analyses prepared by Anchor's credit review group and sent to him via e-mail. Ringgenberg reviewed the analyses and related information to see the bottom-line impact of the changes on the ALLL.

37. As one example, on July 29, 2009, the morning after Anchor's July 28, 2009 earnings release, Ringgenberg received an e-mail attaching analyses of nine separate loans and/or lending relationships. Included therein was the FAS 114 spreadsheet for the "Deere Creek Retail/Steve Stewart" loan/loan relationship ("Deere Creek"). The "bottom line" of that analysis – set forth on the first page of the spreadsheet – was that Anchor needed an additional reserve of $3.674 million according to a May 2009 appraisal.

38. The additional $3.674 million in reserves required for the Deere Creek loans was also reflected in a report Ringgenberg received on August 6, 2009.

39. On August 7, 2009, Ringgenberg e-mailed a file named "114 Tracking Schedule Revised.xls" to Anchor's Vice President of Credit Services for him to review. The spreadsheet's properties identify its author as "Dale" and show it to have been modified last on August 7, 2009 at 2:31 p.m.

40. The file Ringgenberg sent contains FAS 114 reserve increases and charge-offs recorded by Anchor, including a "rollforward" section showing FAS 114 reserves booked

8

between June 30 and July 31. The "New Reserves" section included all of the loans requiring $7.4 million in additional reserves that should have been reflected in Anchor's reported reserves for June 30, 2009.

41. In internal correspondence, Ringgenberg attempted to justify ignoring "subsequent events" by contending that the FAS 165 obligation ended when the company issued its earnings release on July 28, 2009.

42. Ringgenberg directed Anchor's Vice President for Financial Reporting to draft a "subsequent events memo" to Anchor's external auditors that stated: "On July 28, 2009, the Corporation issued financial statements for the quarter ending June 30, 2009 under the definition of SFAS No. 165 when it distributed balance sheet and income statement reports at the annual shareholder's meeting."

43. On August 6, 2009, Anchor's Controller told Ringgenberg that ignoring "subsequent events" after July 28, 2009 was not allowed under GAAP.

44. After receiving Anchor's Controller's criticism of his subsequent events position, Ringgenberg did not send the memorandum to Anchor's external auditors. Nevertheless, Ringgenberg continued to ignore the FAS 165 subsequent events.

45. At the time he signed Anchor's Form 10-Q, Ringgenberg knew, or was reckless in not knowing, that Anchor's June 30, 2009 financial statement should have included additional FAS 114 reserves of $7.4 million.

46. On Anchor's behalf, Ringgenberg signed Anchor's management representation letter to its external auditors dated August 10, 2009. In that letter, he represented that "to the best of our knowledge and belief, no events have occurred subsequent to March 31, 2009 that would require adjustment to, or disclosure in" Anchor's financial statements for the quarter

9

ended June 30, 2009. At the time he made this statement, Ringgenberg knew or should have known that the statement was false.

47. In the management representation letter, Ringgenberg also affirmed responsibility for Anchor's accounting estimates in its financial statements. With regard to the estimate regarding substandard not reviewed loans, however, Ringgenberg falsely represented that the estimate "reflect[s] our judgment based on our knowledge and experience about past and current events and our assumptions about conditions we expect to exist" and that "adequate provisions have been made . . . [t]o maintain an adequate allowance for loan losses." At the time he made these statements, Ringgenberg knew or should have known that these statements were false.

48. For the quarter ended June 30, 2009, Anchor did not have a system of internal controls sufficient to provide reasonable assurances that FAS 165 subsequent events were properly accounted for. Ringgenberg, as Anchor's CFO, was responsible for the design and maintenance of such internal controls and knew that Anchor lacked effective internal controls with regard to FAS 165 subsequent events.

**Anchor Restated Its Financial Statements for the June 30, 2009 Quarter**

49. In August 2009, Anchor's external auditors conducted procedures related to a proposed shelf offering by Anchor. During those procedures, the external auditors examined Anchor's FAS 114 reserves. In that review, the auditors identified reserves of $7.4 million that should have been recorded by Anchor as of June 30 rather than during July. These additional reserves resulted from the updated appraisals and similar information referenced above and included $3.674 million for Deere Creek. The auditors advised Anchor to restate its financial statements for the quarter ended June 30, 2009.

50. Ringgenberg represented to Anchor's external auditors that he had been unaware of the updated appraisals and other information before the filing of Anchor's Form 10-Q on August 10, 2009. At the time he made this representation, Ringgenberg knew or should have known that the statement was false.

51. On September 11, 2009, Anchor announced that it would be restating its financial statements for its quarter ended June 30, 2009. Anchor announced that the restatement would be based "on the adjusted classification of certain non-performing loans" as well as "a re-evaluation of its allowance for loan losses" and that it expected an additional loss in the range of $50-60 million.

52. On October 20, 2009, Anchor filed its restated financial statements in a Report on Form 10-Q/A. The amended report contained an "Explanatory Note" that included the following:

As of the filing date of the original 10-Q, management had updated appraisal information in its possession indicating that several foreclosed properties and repossessed assets had declined in value. There were several transactions (write downs of loans as well as losses on sales of other real estate owned) that occurred in late July that, under SFAS 165, "Subsequent Events," should have been reflected as of June 30, 2009.

53. According to its amended quarterly report, in addition to the adjustments based on updated appraisals and related information, Anchor took additional "charge-offs of collateral-dependent mortgage and commercial loans," reevaluated "other collateral-dependent lending relationships based on information received in July 2009," and analyzed other loans and lending relationships. With the inclusion of the additional charge-offs, the amounts ultimately restated were significantly larger than the items initially prompting the restatement; Anchor concluded that "the provision for loan losses was understated by $51.0 million and net charge-offs were understated by $52.9 million."

54. As a part of the restatement, Anchor reversed Ringgenberg's change in estimate for the "substandard not reviewed" loans. For the restated June 30, 2009 results, Anchor used 100% of representative loss ratios for "substandard not reviewed" loans.

55. Anchor also incorporated FAS 114 reserves in its June 30, 2009 results where the information supporting the reserve was received after June 30 but which pertained to the value of the relevant asset as of June 30, in accordance with FAS 165. Anchor's restated financial statements for the quarter ended June 30, 2009 properly reflected the $7.4 million in additional reserves required under FAS 165 that had been incorrectly omitted in Anchor's original quarterly report.

## FIRST CLAIM FOR RELIEF

### Securities Fraud by Anchor and Ringgenberg
Violations of Exchange Act Section 10(b)
and Rule 10b-5 thereunder

56. Paragraphs 1 through ___ are realleged and incorporated by reference.

57. By engaging in the conduct described above, Anchor and Ringgenberg, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the sale of Anchor's securities, with scienter made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to purchasers and sellers of Anchor securities.

58. By reason of the foregoing, Anchor and Ringgenberg violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Reporting Violations by Anchor and Ringgenberg**
**Violations of, and Aiding and Abetting Violations of, Exchange**
**Act Section 13(a) and Rule 13a-13 thereunder**

59. Paragraphs 1 through ___ are realleged and incorporated by reference.

60. Exchange Act Section 13(a) requires issuers of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission annual, quarterly, and other reports in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security.

61. Exchange Act Rule 13a-13 requires issuers of such securities to file with the Commission quarterly reports on Form 10-Q.

62. By engaging in the conduct described above, Anchor violated 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rule 13a-13 [17 C.F.R. § 240.13a-13].

63. By reason of the foregoing, Ringgenberg knowingly provided substantial assistance to and thereby aided and abetted, as defined at Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Anchor's violations of Section13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rule 13a-13 [17 C.F.R. § 240.13a-13].

## THIRD CLAIM FOR RELIEF

**Record-Keeping Violations by Anchor and Ringgenberg**
**Violations of, and Aiding and Abetting Violations of, Sections**
**13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

64. Paragraphs 1 through ___ are realleged and incorporated by reference.

65. By engaging in the conduct described above, Anchor, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*]: (a) failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the

13

transactions and dispositions of its assets; and (b) failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that: (a) transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and (b) to maintain accountability of assets, in violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

66. By reason of the foregoing, Ringgenberg knowingly provided substantial assistance to and thereby aided and abetted, as defined at Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Anchor's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### FOURTH CLAIM FOR RELIEF

**Falsification of Accounting Records by Ringgenberg**
Violations of Exchange Act Rule 13b2-1

67. Paragraphs 1 through ___ are realleged and incorporated by reference.

68. By engaging in the conduct described above, Ringgenberg, directly or indirectly, falsified or caused to be falsified, a book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

69. By reason of the foregoing, Ringgenberg violated Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FIFTH CLAIM FOR RELIEF

**Disclosure Certification Violation by Ringgenberg**
Violations of Exchange Act Rule 13a-14

70. Paragraphs 1 through ___ are realleged and incorporated by reference.

14

71. Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] requires that an issuer's periodic reports filed under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] include certifications in the specified form and also signed by the issuer's principal executive and principal financial officers.

72. On August 7, 2009 Ringgenberg certified Anchor's quarterly report on Form 10-Q for the quarter ended June 30, 2009.

73. Specifically, Ringgenberg certified that he had reviewed the report and that, based on his knowledge, the report did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and, based on his knowledge, the financial statements and other financial information included in the reports fairly presented in all material respects the financial condition, results of operation, and cash flows of Anchor for the period ended June 30, 2009.

74. At the time Ringgenberg made this certification, he knew that the report contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

75. Ringgenberg also certified that he and Anchor's other certifying officer had disclosed any fraud, whether or not material, that involved management.

76. At the time Ringgenberg made this certification, he knew or should have known that the report did not disclose all fraud, whether or not material, that involved management.

77. By reason of the foregoing, Ringgenberg violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SIXTH CLAIM FOR RELIEF
**Lying to Auditors by Ringgenberg**
Violations of Exchange Act Rule 13b2-2(a)

78. Paragraphs 1 through ___ are realleged and incorporated by reference.

79. Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] prohibits an officer or director of an issuer from making, or causing to be made, materially false or misleading statements to an accountant in connection with audits, reviews, or examinations of an issuer's financial statements or in the preparation or filing of an issuer's documents or reports required to be filed with the Commission; or omitting to state, or causing another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with audits, reviews, or examinations of an issuer's financial statements or in the preparation or filing of an issuer's documents or reports required to be filed with the Commission.

80. By engaging in the conduct described above, Ringgenberg violated Exchange Act Rule 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

a) permanently restrain and enjoin Anchor from violating Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13a-13];

b) permanently restrain and enjoin Ringgenberg from violating Exchange Act Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules

16

10b-5, 13a-14, 13b2-1, and 13b2-2(a) [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2(a)] and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rule 13a-13 thereunder [17 C.F.R. § 240.13a-13];

c) order Ringgenberg to pay a civil money penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

d) bar Ringgenberg pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports pursuant to Exchange Act Section 15(d) [15 U.S.C. § 78o(d)]; and

e) grant other such relief as the Court may deem necessary.

Dated: August 14, 2013

Respectfully Submitted,

*/s/ Matthew Greiner*

Scott W. Friestad
David Frohlich (D.C. Bar 425928)
Matthew B. Greiner (D.C. Bar 448480))

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5030
Telephone: (202) 551-4526 [Greiner]
Facsimile: (202) 772-9286 [Greiner]

17